Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th circuit is now open according to law. God save the United States and this honorable court. Good afternoon, counsel, judges branch and Luck and I appreciate your making yourselves available on such short notice to have oral argument. So we'll get right to it and I will call the case for the benefit of the recording. It's number 22-12242 James Edward Barber Petitioner Appellant v. Governor of the State of Alabama et al. Respondents, appellees. Counselor Mr. Barber, you may begin when you're ready. Good afternoon, may it please the court. Mara Klebanner from Sidley Austin for Appellant James Barber. Mr. Barber's case presents exactly the conditions that the Supreme Court has articulated are required to succeed on an Eighth Amendment method of execution claim. First, there is uncontroverted evidence that Mr. Barber faces a substantial risk of serious harm. Before you get to the merits of the argument, the appellees argue that Mr. Barber is not entitled to a stay of execution because he unreasonably delayed seeking relief in federal court. They say that he had all the information necessary to file this claim no later than November 17, 2022, which is when Mr. Smith's file in federal court until May the 25th of 2023, and then the rest of the timeline that brings us up to today. Sure, yeah, I would be happy to talk about timing in this case and to address what I think may be the court's concern here. This is not a lying in wait claim that was intentionally brought at the 11th hour. What happened is Alabama botched three executions in a row last year, then imposed a moratorium and started an investigation into lethal injection to remedy its problems. Mr. Barber did not know that he was next in line for execution in Alabama until February 24th of this year, when the state moved the Alabama Supreme Court to set his execution warrant on the same date that it announced it was ending its moratorium and investigation. Counsel, why does that matter? In other words, there's no requirement, as I understand, under the statute of limitations or for bringing it, that he has to have a pending execution warrant. If he knew the facts and the facts accrued, and I think you and I would all agree that, at least at the latest, it was November of 2022 that his claim accrued. We can agree on that, and that's when the claim accrued, and that seems to be how I read NANS. Then why is it not a delay even if he was waiting for his turn to come up? Understood. So in this case, there was a very unusual circumstance given the moratorium and the investigation. Mr. Barber and his legal team did not know if at the end of this moratorium and investigation, the state would continue to attempt lethal injection executions or if it would move on to the available alternative of nitrogen hypoxia given the problems it's been having with lethal injection. So in that interim period, when it wasn't clear how or whether the state would proceed with executions, it did not make sense for Mr. Barber to bring a claim based on lethal injection executions. That's at least, that's a state of Alabama law. I would imagine that if the state had come back and said, you know what, we're doing away with lethal injection and we're forcing everybody now, even though you explicitly chose not to, to use hydrogen hypoxia, I imagine we'd be here, but be here under very different circumstances. And so it just seems to me that if Alabama law required lethal execution, and it did, and it only accepted it if it was an affirmative election for nitrogen hypoxia, which your client, different than about 50 or so others, explicitly did not select, then it seems to me that wouldn't a careful litigant want to litigate that claim as soon as possible if they knew that claim occurred? Yes, your honor. And to clarify, Mr. Barber filed a motion in opposition to the state's motion to set his execution date in the Alabama Supreme Court in the fall of, in September of 2022. So as soon as he saw what happened in Mr. James's botched execution, he jumped on his rights in the Alabama Supreme Court. There was a period of time, you're right, when the state was investigating its issues with lethal injection that Mr. Barber could have brought a claim, but didn't given that he had litigated it in the Alabama Supreme Court and the state had withdrawn its motion for his execution date from the Alabama Supreme Court. You, just one more thing about timing and then we can move on. You suggest in your briefing that Governor Ivey caused the time crunch by seeking an execution date when she did, but that didn't affect when you chose to file, right? Because it was after May 25th. Well, your honor, just for a little context on that point, as soon as the state moved to set an execution warrant for Mr. Barber in the Alabama Supreme Court on February 24th, Mr. Barber immediately began litigating very similar merits to the claim that he's litigating in this court in the Alabama Supreme Court. So he filed a motion for a stay of execution based on the pattern of botches. He filed a motion for discovery and he requested other relief. You agree with me, there's no exhaustion requirement with regard to this, at least with regard to a 1983 Eighth Amendment claim, correct? I would agree with you, your honor. The state of Alabama has argued otherwise in federal district court, but I agree with you, there's no exhaustion requirement. It was possible for us to have filed in district court. Why wouldn't you? Why not just bring both in February and just say, hey, district court, we're litigating this below, hold onto this for a moment. I can't imagine any district court not staying it or going on parallel tracks given where this thing was headed. Well, in the circumstance that we had filed a lawsuit based on lethal injection and then effectively immediately asked for a stay, I think we would be in a very similar position to what we are in now, which is that discovery could really only start happening once the state concluded its investigation and its moratorium. And that timeline is what the timeline is now because of Governor Ivey's decision to set the execution timeframe to begin when it does. So just days after Mr. Barber filed his lawsuit in the middle district of Alabama, Governor Ivey decided to set an execution date that left less than two months for litigation. The state manufactured this emergency and it would be perverse to punish Mr. Barber for the governor's decision. Governor Ivey's choice of execution date was an attempt to take advantage of Supreme Court precedent that frowns upon last minute court challenges. And it was an attempt to pull the rug out from federal review of this extremely serious constitutional problem. If there are no further questions, I'm delayed. Yes, you may move on. Thank you. Okay, thank you. As I was saying, this case presents exactly the factors that the Supreme Court looks for in an Eighth Amendment method of execution claim. First, there's uncontroverted evidence that Mr. Barber faces a substantial risk of serious harm. Second, there's equally uncontroverted evidence that there is an alternative available method of execution that substantially reduces the risk of harm. That's nitrogen hypoxia. Third, with respect to a stay, and as we were just discussing, the equities weigh in Mr. Barber's favor. The emergency nature of these proceedings is not Mr. Barber's fault. I intend to elaborate on all three points, but at the outset, I want to highlight that there is no dispute about one of them. Nitrogen hypoxia is an available alternative and the state does not dispute that. I'll start with the first point, risk of harm, because it's the basis of the district court's decision. The evidentiary record on the risk of serious harm to each of the 2022 execution proceedings of Joe James, Alan Miller, and Kenneth Smith, puncturing all over the men's bodies with needles while trying and failing to establish IV access. Counsel, how do you get around our opinion in Nance v. Commissioner Georgia Department of Corrections, where we said that the district court correctly rejected the argument that a futile attempt to locate a vein would give rise to a constitutionally intolerable level of pain. The Eighth Amendment does not guarantee a prisoner a painless death. That's right, and we certainly are aware that Mr. Barber is not guaranteed a painless death. Nance is distinguishable from the case at hand, given that the plaintiff in Nance was alleging pain that might be caused by attempts to find a vein with no pattern of state issues in attempting to find a vein. Counsel, can I ask you, why does the pattern matter? In other words, why does the nature of the futility matter? If the futility is because of personal medical issues or because they botched it the last three times and they know they're not going to be able to do it, how does that matter to the holding of Nance? In other words, why does the underlying fact that the futility matter isn't what's legally important, is that it's futile and still does not cause an Eighth Amendment? I want to make sure I understand your question. I'm sorry, could you could you Sure. Judge Branch read you the holding of Nance, which you agree with. Yes. And what you said is distinguishable because Mr. Nance did not show a pattern of botched executions like the plaintiff here, like your client did. And I guess my question to you is, why does that matter? What does the nature of the futility matter to the holding in Nance? In Nance, you're right, in that case, he had weak veins that could not have a needle in it. That was what we said was plausibly alleged. And still, we said that that futility doesn't matter. If Nance had said, you couldn't do it because you haven't done it the last three times. And so you're not going to do it now. Why wouldn't the holding be the same that whatever futility is there is not an Eighth Amendment problem? Okay, understood. Thank you for the clarification. The reason why what happens last what happened last year matters is that it goes very directly to the substantial risk of serious harm prong under the Eighth Amendment. And we know from the very limited admissions that defendants have made in this case, that defendants did their best to investigate what happened last year, and the state concluded they did nothing wrong, and they don't need to make any changes to their execution procedures. So under the facts we have now, we're able to see from what happened last year, we have a very strong chance of substantial harm, given that we know the substantial harm took place last year. And the state has conceded that it is not attempting to remedy any of the things that went wrong last year. Although unfortunately, because the state has refused to produce discovery or explain itself, and in those three executions, we do not know fundamentally the nature of what went wrong in those executions. What is your authority for obtaining the results of the internal investigation? So to clarify, I don't think we have any specific legal entitlement to the results of the investigation other than the civil discovery rules in this case. I think the information about what they learned and what they changed and why is very probative to Mr. Barber's Eighth Amendment claims. The state has really refused to produce any meaningful information about that investigation, but there isn't a separate cause of action for being entitled to the results of it. But you also keep saying they made no changes, but that's not for instance, that the IV team personnel is completely different. And so even with that, looking at that change alone, why isn't that change where nobody who was performing those needle sticks before is on the team now? Why isn't that change alone enough to disrupt the pattern that you're pointing to in the prior executions of the difficulty gaining IV access? Thank you, Judge Branch. I'd be happy to speak to the turnover in the IV team. So a new IV team does not solve ADOC's execution problems because the state never said the protracted IV attempts in the 2022 execution proceedings were the result of insufficient vetting of the IV team or the credentials of the IV team or anything to do with the IV team. To the contrary, the state said only that the amount of time was the problem, not the IV team. The district court in its opinion was crediting the state's decision to hire a different IV team for fixing a problem that the state does not agree exists. So there is no evidence that the state changed their method for choosing people on the IV team. The state has given us no particular information about any of them, just redacted images of EMT licenses. On this record, all the people the state chooses to staff the IV team are fungible and the same. It's like picking up a different can of soda off the shelf from a factory that isn't passing safety inspections. The state used the same standards of quality control and they're going to get the same product. Let me ask you though, to Judge Branch's question, in the letter that the commissioner wrote to the governor, he explains in paragraph three, I pledged everything is on the table from our legal strategy dealing with last minute appeals to how we train and prepare, to the order and timing of events on execution day, to the personnel and equipment involved. Each of these has been considered. And then on the following page, he says the department has also decided to add to its pool of available medical personnel for executions. So even though the investigation doesn't say the personnel was the problem, isn't that implied from the letter where after the investigation, they're making personnel changes? Unfortunately, your honor, it's just not clear still if that was the problem. I agree. It seems to be one of the possible problems, but the state refuses to say whether the IV team was a problem. And we asked specifically in this litigation, whether the state found any deficiencies whatsoever in its execution procedures as a result. But counsel, the state's acknowledgement is not really the issue, right? I mean, the issue is whether it's more likely than not that there's going to be substantial increase in pain and isn't an acknowledgement that, hey, we're using new people. Those people are licensed and certified. I've interviewed those people and each one of them has experienced them putting IV. It's not unreasonable for the district court to conclude that there's less of a likelihood of a substantial risk of pain under those factors. So I think it was unreasonable given the paucity of evidence that the state actually introduced in the preliminary injunction evidentiary hearing for the district court to conclude that sufficient change had been made to the IV team to interrupt the pattern. Let's talk a little bit. The letter that Judge Pryor mentioned was in evidence, correct? I believe it was, yes. Right. That letter specifically had those things I just stated, right? That I interviewed them, that it's a new pool, and that those things, these people have experience doing that, right? I'm talking independent of the affidavit. So that language about someone being interviewed and vetted and having the experience, that comes from the Warden-Raybon affidavit, not from the letter between the commissioner to the governor. Doesn't the letter specifically state that one of the Warden's letters that was introduced in evidence state that those that were going to be doing it are more experienced, have extensive experience in putting IVs? Yes. I think I know what document you're referring to. It was an affidavit signed by a defendant in this litigation, Warden Terry Raybon, that the defendant introduced for the first time into evidence during the July 15th. I'm not talking about the affidavit, though. I'm talking about the letter. The letter, I thought, specifically stated that those who were IVs had more extensive experience, or had extensive experience putting in IVs. Is that correct or not? My best recollection, I don't have the document in front of me, is that the letter from the commissioner to Governor Ivey on February 24th did not say that the current members of the IV team had better experience than the members of last year's team. But I can't say for sure, just I wouldn't want to make a misrepresentation. I can speak to the contents of Warden Raybon's affidavit, because I think it gets to a similar point of what you're asking about. Well, let's go to something else. You mentioned about time. So it's absolutely clear that with regard to the Smith and the Miller executions, that time was a significant factor. I happen to have a little experience with the Miller execution, because I was on the panel during the Supreme Court litigation there. And there, the Supreme Court, as I recall, didn't rule until either 9 or 10 at night until they had the go ahead to go. And at that point, the execution team then starts the beginning of its protocol, which includes the IV part. And then with regard to the Smith, it went something similar. I think it was 9 or 10 at night until the Supreme Court ruled. That's been done away with. They now have about 30 hours in which to do it, so you no longer have the midnight deadline problem. Why is it not more reasonable to conclude that problem going away? Why is it not more reasonable for the district court to conclude with that problem going away that there's less of a likelihood of a substantial risk of a problem with the IV team? So ADOC having more time to execute Mr. Barber is not a logical basis to decide that the state has made a meaningful change for the better, because if anything, more time is worse under the Eighth Amendment, given ADOC's track record. This Courtney Smith, you assume that more time means that they're going to have more time to do the IV. More time means doing the entire protocol from soup to nuts. In other words, there's a lot more to it than just inserting an IV. There's bringing him to this particular part. There's putting them there. There's reading certain parts of the warrant. There's a lot of things that go into this, as you know. So the question is not more time to do the IV. It's more time to do all of it. We'll take less pressure off of that part of it. Is that not a reasonable inference for the district court to draw? So the uncontroverted evidence in this case shows that ADOC had more than sufficient time. Indeed, they had multiple hours to start the IV lines on Mr. James, Mr. Miller, and Mr. Smith last year. And that's taking into account all the aspects of the protocol that Your Honor just mentioned. So, for example, taking him from the holding cell down to the checklists, bringing in the IV team, swabbing for sanitation, all those things. That's including with all that. They still had multiple hours for all three of those men, which shows that they How can it be multiple? How's that? How can it be multiple hours? For one of these, I believe the Supreme Court didn't rule until like 10 30 at night. And the execution thing and the execution deadline was at midnight. I mean, by definition, that could not be multiple hours. Well, maybe I could just give you the example of Alan Miller because that's the case I worked on. It's the one most familiar with. So in Mr. Miller's case, the Supreme Court ruled at nine o'clock and he was strapped down to the execution during about 10 o'clock. So while there are intervening steps, as you say, to getting him from the holding cell down to the gurney and there are procedures that the prison has to follow to make sure that that's done properly, he's put into leg irons, he's walked by a large group of guards to the gurney. All of those things happen, but they don't take a very long time, particularly in these cases where there has been no allegation by the state whatsoever that any of these men resisted. So walking someone down from their holding cell to the gurney, you know, it takes the time that it takes, but it doesn't take hours. And so that did genuinely leave. In Mr. Miller's case, we think a full 90 minutes when they were puncturing his body with needles. In Mr. James's case, he was strapped down to the gurney for three hours while they were puncturing his body with needles. And in Mr. Smith's case, we know that they were puncturing him for two full hours. So based on the uncontroverted evidence from three medical experts in this case, we know that it is not reasonable to take multiple hours to try to start IV access, even if, and there's no allegation that this took place last year, but even if there was an uncooperative or difficult patient. Can I ask you about the second prong? So the second prong of the, of the aid master, however, you know, whichever case you want to rely on. So I agree with you, there isn't a dispute that it's a reasonable available nitrogen hypoxia. What evidence was introduced in the record that there's a significant reduction in pain from nitrogen hypoxia, which is also part of that test. So the evidence on that front is fairly self-explanatory. That is that nitrogen hypoxia is a gas, the Alabama department of corrections, that, that which they have revealed about their nitrogen hypoxia reveals that they will not be using IV lines or anything that would process will actually entail, but we believe it involves placing a gas mask over the face of an inmate and starting the flow of pure nitrogen. In price though, didn't we say that, that, and I get the claim in price was a little different here, but didn't we say that that didn't necessarily indicate a significant reduction given that there's 20 to 30 seconds of essentially suffocating from, from poisonous gas as you're being executed versus someone who is essentially sedated before they took poison in your veins? I think more on point than price in this case is this court's recent holding in Smith where the court held that nitrogen hypoxia, because it completely eliminates the risk of the problems ADOC is having with IV access, nitrogen hypoxia does reduce substantially reduce that risk of harm. The problem is, sorry, I apologize. Oh no, go ahead. No, please go ahead. Oscar, are you suggesting that we, that when Alabama has nitrogen hypoxia up and running, that we're not going to face any challenges to it as cruel and unusual? You know, I certainly can't speak for what everybody in the state of Alabama is going to do when the state gets ready on nitrogen. I can say that in this litigation from the beginning, Mr. Barber has been asking for one thing, and that is that his execution be carried out by to be experimented on. If, if the state does something to demonstrate that it's patently rushing itself, or it's obviously not ready to do a procedure that it wants to try experimenting on, that, that presents obvious problems for men in Holman and for the courts. But that is genuinely the relief we are seeking in this case. Okay. If I could continue, unless there are any other questions. Okay. So there is no evidence to support the district court's conclusions regarding the state interrupting its own pattern of failures. I'd like to just take a little more time to talk about how the other factors in this case align with Supreme Court precedent are the equities of the situation. There will be irreparable harm to Mr. Barber. Death is final and there is no The state does not contest that this factor weighs in Mr. Barber's favor. There will be no prejudice to the state if this court grants a stay. Mr. Barber is not contesting his death sentence, and the state is almost ready to proceed with nitrogen hypoxia. Just this February, Commissioner of the ADOC Ham said that they would be ready to proceed with nitrogen hypoxia by the end of this year. So the state can execute Mr. Barber by the end of this year in the state's own estimation. And the public interest is aligned with the relief Mr. Barber seeks. There is record evidence in this case of the public of Alabama pleading with Governor Ivey to introduce more transparency and accountability into Alabama's execution process. Put simply, this is not the typical method of execution challenge. The public interest is significantly heightened in this case due to the historic and unprecedented nature of ADOC's failures. I'll reserve the rest of my time unless there are any questions. Thank you, Ms. Kovanner. Mr. Anderson, you may begin when you're ready. Thank you, Your Honor. May it please the court, I'm Richard Anderson on behalf of the appellees. History didn't begin in July of 2022, and it didn't end in November of 2022, but that's what Barber would like for this court to believe after failing to convince the district court of that. You see, Barber's arguments and the entire claim he presented to the district court rested on the idea that what allegedly happened to James, Miller, and Smith was the rule, not the exception. Barber couches his arguments in that fashion because he hopes to show that the defendants are incompetent, brutal, uncaring ogres who are deliberately super adding pain to the execution process. The problem is that history doesn't support that effort. What history does show is that over two decades, the state of Alabama has successfully carried out dozens of lawful, humane executions by lethal injection, with only one case of Doiley Ham in 2018 in which IV access couldn't be obtained. The unfortunate fact for you, Mr. Anderson, is that the last several executions, all the ones before this, three I think it is, there have been problems. That's correct, Your Honor. There were certainly two executions in the fall of 2022 in which the state wasn't able to gain IV access, but those two can't be looked at as, you know, in excluding all of the rest of history because history shows that that's an aberration and not the rule. And it also shows, and this is important in dealing with Barber's fundamentally speculative arguments, can only hope to get traction if by pretending that the execution procedures that have been largely unchanged for two decades are responsible for what happened in the Miller and Smith cases, and that because of that, the same thing's going to happen to him. To be sure, as I say, Your Honor, we don't dispute that there were problems with regarding those, just as we have shown that some of the hyperbolic allegations about Joe Nathan James really can't be credited. But you would concede that after the last three executions, there was public outcry and it was serious enough that the governor ordered a review. And yes, Your Honor, and that's critical because while this is, the complaint is couched in terms of an attack on the protocol, he doesn't acknowledge the fact, really, really deal with the fact that the defendants redid this, not as par for the course or just, oh well, we've cruelly and unusually executed a couple of people. They took action and the state did commence a review. They looked at a number of factors that we've discussed and I've heard discussed this afternoon, including the time pressure. As the defendant Ham pointed out in his letter, they looked at personnel and they made concrete changes, both to the way in which we schedule executions in order to create more room for that last minute litigation, though, of course, we hope to avoid that, but also changes to the personnel. And that's critical because so many of Barber's allegations in his complaint, that is the complaint that was actually before the district court, rely on what the I.V. team did or allegedly did during the Miller and Smith preparations for execution or incident. Let me ask you this question. I think your argument sort of evidences this, but the department has consistently denied that anything went wrong during the executions or attempted executions of James Miller and Smith. And in fact, in your interrogatory response, you said no deficiencies were found in the review. So my question is, has the department ever provided an explanation for the difficulties in those incidents? Well, your honor, the interrogatory response that you referred to was whether there were any changes to the procedures. That's the way the interrogatory was couched to us. And in the defendant's mind, that we took that to mean the protocol and the actual the procedures that we employ. All right. Well, then my question is, have you ever. Well, answer my question first. Has an explanation ever been given for the difficulties? The there is. Those two preparations for execution that were unsuccessful as the as our defendant Ham pointed out, we ran out of time and every every case, even in a medical setting in which you're trying to gain intravenous access as a number of different factors that can come into play. What was one of the reasons why the ADOC decided to expand the pool and that, you know, get a more diverse group of experience for the medical personnel? So they have now advanced EMTs, paramedics and the nurse. All right. Well, before we get to that, though, it was acknowledged publicly, wasn't it, by the department that there was difficulty in setting IV lines over a period of time. Isn't that right? I believe that that is that is that's fair enough, your honor, that with the Miller and Smith cases, we had difficulty or DOC had difficulty setting IV lines with those two men. And that's ultimately why the execution was unsuccessful is. Time ran out, and I would note also that, of course, defendants, the IV team, ADOC did not continuing continue puncturing out of those men with needles up until eleven fifty nine. At some point, the decision was made that we can't get it done before the end of the night, because it's always been the ADOC's view, our view, defendant's view, state of Alabama's view, that the obtaining IV access is a separate process from the execution itself. All right. I understand your argument in that regard. But were there problems with the personnel's training or experience that contributed to the difficulties in setting IV lines? I can't speak to that, your honor. Well, who can? I mean, because I haven't seen where that's ever been provided in this litigation. The in the letter that defendant Ham sent to the governor at the conclusion of the review, he indicates that one of the decisions that was made was to have a broader pool of new personnel who are available. And as we've indicated in our discovery responses in this case so far. That pool of personnel who are going to be available for this execution does not include anyone who participated in those two prior executions. And that's the best way I can answer that. All right. Well, so here's my problem. If no explanation has ever been given, how can you establish the causal link between the personnel changes and stopping the difficulties that have occurred in the pattern? Well, your honor, I would say that really the problem here is a problem for Barber and that he is the movement with the burden. And what he has to show is a substantial likelihood of success on the merits and the view of the district court. The emerging pattern that this court discussed in Smith gave Barber a window through which he could avoid the limitations period that would ordinarily have barred all of his claims about the protocol. The problem is that by using that window, Barber has linked himself really inextricably to the allegations about what happened with Mr. Miller and Mr. Smith. And those allegations are very personnel specific. They are allegations that particular people did particular things. And from that, he speculates that those people will do the same thing in preparation for his execution. Now, the interruption, the severing of that link is really fatal to his claims because the state has one has looked at what happened, has decided to employ a broader pool of new personnel who have relevant experience and qualifications. And there's simply not anything that Barber can point to that's going to show either that that was a bad faith effort or that he has a substantial likelihood of success on the merits in this case. That link is severed. Yes, Your Honor. Mr. Anderson, let me ask you, you were talking about the experience of the people who are now in the IV team pool. And I just was unable to is the requirement that the IV team personnel be licensed or certified in the United States, a new requirement? Was there any such requirement in the old protocol? Yes, Your Honor. That is one of the changes that's been made to the protocol and that it now states that those personnel to be licensed certified. That's in fact, and Mr. Barber's complaint. One of the things that he argues is that that that requirement is insufficiently specific. That's why one of the reasons why the defendants wanted to provide involuntary discovery, the licensures and certifications of the members of the IV team to try to allay that concern that he had expressed in his complaint. Of course, that was not satisfactory as we expected. So at the evidentiary hearing before the district court, Mr. Barber continued to speculate and offered speculation that, well, perhaps those people don't have any experience. At that point, we were compelled to offer in rebuttal an affidavit from Mr. Hamm in which he laid out what really should be an unsurprising fact that when the state of Alabama was employing someone to do a job, they asked if they had relevant experience. We really don't think it's credible that anyone could be surprised by that fact, but because of the speculation of the hearing, we had to put that in. And that is, you know, so again, the new protocol, I suppose, the latest version, had that new requirement of licensure and certification. And I can't remember if it, I don't know if it's, I believe it says appropriate, but it says licensure and certification in the United States, and we introduced evidence of exactly what that certification was. So to get back to what I was explaining to Judge Pryor, the change in personnel has really in a material way, one, it's demonstrated a good faith effort by the state to make a material change as a result of those two incidents in the fall of 2022. And it really severs that causal link between what was described as the emerging pattern and what we were actually looking at going forward. And the district court plainly did not abuse its discretion when it was looking at broad discretion over and determining that Mr. Barber simply didn't have a substantial likelihood of success on the merits there. Let me ask you, since you brought up the abuse of discretion, you say in your response to the motion that the standard is abuse of discretion, but under Price, isn't the issue or the standard whether Mr. Barber has shown a substantial likelihood of success on the merits of his claim, or is it on the merits of his appeal? Well, essentially, it's the same standard. This court has expressed in other cases that the chances of success on appeal really depend on the chances of success in the district court. So we're kind of in an opposition here because we have one emotion for a stay, and we have to an appeal from a denial of a preliminary injunction. And the standard for the denial of the preliminary injunction is abuse of discretion. For the stay, Mr. Barber has to show that he has a substantial likelihood of success in this appeal, which also depends on him showing the substantial likelihood of success below. So it may be something of a distinction without a difference, Your Honor. I would actually like to turn, Judge Pryor, to your question to Mr. Barber about timeliness and speak on that briefly, because I think there are some important points there. The first being the pretty axiomatic point that it's always in the plaintiff's control when he brings a complaint, once he has the information he needs. That's the decision the plaintiff has. In this case, we can look back at history of the fall of 2022, and we see that Mr. Smith filed a complaint based on the Joe James execution, as did Mr. Miller. Mr. Smith then amended his complaint based on the allegations of what happened in the Miller situation. Mr. Barber had a pending motion to set an execution date at the time. Of course, he didn't do anything. We have the review period and what's been categorized or described as a moratorium. It was a pause, I think is the way the governor put it. And once that was concluded on February 24th... Has it been the state's position, as your opposing counsel said, that a plaintiff has to exhaust state remedies in the Alabama Supreme Court before bringing a method of execution, an eighth amendment claim? No, your honor. And it's something I noted down to speak on, is that opposition to a motion to set an execution date is typically not an area. Historically, I'm not aware of any case in which the Alabama Supreme Court has granted relief or discovery or engaged in any kind of proceedings in that opposition. That typically would happen in a state rule 32. And I think there may have been arguments in previous cases that a federal litigant should have gone in a 1983 case, could have gone to state court. But I don't know of any cases that have really decided that one way or the other. What I would point to is that Mr. Barber... Was that argument made in opposition to Mr. Barber's motion to file it in first, I think, July of last year, and then again in February of this year? We did not file a response to either of the oppositions to the motion to set an execution date. So that would not have been something that was said. But you just look historically in the case law, and I'm not aware of any case in which the Alabama Supreme Court has engaged in discovery or anything of that nature in opposition to a motion to set an execution date. Is there really a reasonable basis on which to delay filing a federal action? I can't speak to that. But what I can speak... Yes, sir. So your opposing counsel's response was one was that, but the other response, and I think the main one, both in the papers and here, was the delay is your fault. In other words, you being the state. The governor has full discretion on when to set this thing. And the governor could set the six months off knowing that a lawsuit had been filed to allow it to come to its conclusion, rather than setting a date. What was it? Two months or 45 days after the authorization was given by the Alabama Supreme Court, right? Your Honor, what I would point to is that there's no case law, there's no principle that a state which is charged with carrying out a lawful execution to get justice for the citizens of the state and the victims, that a state can be indefinitely delayed in seeking that justice because a federal prisoner happens to file a lawsuit. Counsel, I don't think and I don't hear opposing counsel to be saying that the state's hands are tied in any way from setting the execution date. I think what I hear your opposing counsel saying is that having said it, you can't argue delay to us. Those are different things. Well, Your Honor, if you actually look at the way the timeline worked out here, we filed the motions at the execution date on February 24. That's certainly a point at which Mr. Barber could have pursued these claims. Then the Alabama Supreme Court granted the motion, which put the ball in the governor's court and defended Ivey's court. And then Mr. Barber continued to wait. And presumably had Governor Ivey just decided to sit on her hands after Mr. Barber filed his complaint, would still be waiting. I mean, that's the problem is that the precedent for allowing a complainant, a petitioner in a 1983 case to indefinitely delay justice by filing an action. It would really obviate all of the case law that this circuit and the Supreme Court has put out there about last minute stays of execution because it would make that unnecessary. If you could get your action filed before your execution was scheduled, then you would automatically obtain a stay. If that were the principle that worked here, Your Honor. So that's why. Let's say I agree with you for the moment on delay, at least as to some extent. How does that weigh into the equities here? Does that mean that automatically the state wins and the plaintiff loses? Or does it mean that we consider that as part of the larger equitable balancing, along with substantial likelihood of success in the merits and public interest and all of those sorts of things? I would say, Your Honor, that the Supreme Court's precedent say in Bucklew gives us some good advice on that. That's one of the factors the court can consider with the Supreme Court said that last minute stays should be the extreme exception and not the norm. And that's what the state is arguing here. We believe that the substantial likelihood of success prong that factor strongly argues against granting either the stay or reversing the denial of preliminary injunction. Uh, we believe that the delay is a factor that this court should consider and certainly plays into the equities of it. We don't hang our hat on that by any means, Your Honor. We think that on that on the merits, this is a a clear absence of abusive discretion here. Let me ask you about a slightly different aspect of the timeline. And my my understanding is that as soon as the motion was made in the Alabama Supreme Court, Mr. Barber filed discovery requests. The state said, We will not give you any substantive responses. They moved to compel and that wasn't that was denied. Then he comes to federal court and the state agrees to give expedited responses, but really doesn't give much of substance. So speaking only for myself, not for the panel, I see a both the litigants and the courts about what has happened and what's likely to happen in the future and then coming in at the last minute with an affidavit that says, trust us, everything will be OK. In fact, that very thing happened after Mr. Smith filed his claim. And he said, here's what's going to happen to me. State said, it's fine. We're prepared. And then basically that same thing happened. So that if if you're so in the right here, why isn't the information being produced about the investigation, about what the cause was, about what specifically is being done to alleviate the problems? We are all I can say is that certainly different states have taken different approaches here in a number of ways. The Mr. Barber relies heavily on the fact that the state of Tennessee decided to do a report. Of course, that's really just window dressing because it's the results that matter. I agree. I agree with you on that. But I'm just saying, why not just give a bunch of information? And I believe that Mr. Barber has consistently agreed to enter into a protective order or confidentiality order to protect information that might put the personnel in danger. So why not be more forthcoming? Your Honor, there are very strong concerns that states have with security over executions because of documented incidences where once someone's name is out there, the person, whether through fear of retribution or actual retribution or threats of retribution, will withdraw from the process. We have previously lost an expert regarding nitrogen hypoxia on that basis. Other states have had other problems where people have been threatened, suppliers of various kinds have been threatened. And the state, we think that we attempted to do a very reasonable middle ground here after Mr. Barber made these allegations about unlicensed, uncredentialed people. It made it sound as if we were bringing somebody off the street. We provided voluntarily without having the court have to intervene the certifications and licensure for those folks in a way that would protect their identity and their privacy. But you see, we don't know whether the people who did it before had the same or similar credentials. We don't know whether they were licensed, whether they were also EMTs or nurses as shown in the licenses and certifications. And the problem is here, the state has the ability to move this case by executing Mr. Barber before he ever has a chance to get discovery. Well, one of the things I would say in response to that, Your Honor, is that it goes back to what I said at the beginning of this case, that we can't only look at what happened in two executions where IV access wasn't obtained. We have to look at history too. And if Alabama really was cavalier about who they were retaining to do this work, I would expect a much longer pattern than the one this court observed in its unpublished decision in Smith. Because, you know, what we have is a state made a good faith effort to review what went wrong in the eyes of the plaintiff, Mr. Barber, to address some of those concerns with evidence about what the qualifications of the people were. And we saw that that was not satisfactory, that speculation continued. And here we are, once again, the inevitable result seems to be we're in the 11th Circuit on execution week under a briefing schedule that had Mr. Barber had his way would have had briefing conclude tomorrow and presumably oral argument being held on Wednesday. Um, that is precisely what the state has been trying to avoid that time crunch, this last minute, 11th hour litigation. Um, we tried to do that by disclosing what we thought was some relevant information about the execution team, the IV team rather. And, uh, and here we are. I understand your honor's concern. Um, sovereign states handle things in different ways is all I can say. And in this instance, the judgment was made that we would do a review and not, uh, you know, a hearing process or something like that. We have done that. We have addressed, uh, issues that were identified as that review that defendant Ham spoke to in his letter personnel training timeline. And as the district court properly found in exercising discretion, that severed the causal link. It broke that, that, uh, pattern, um, that was there when, uh, you know, the, the, at least allegedly was there when Mr. Barber filed. I'm sorry, when Mr. Smith filed was Mr. Miller filed. Now history's moved on. We have done this review. We have made material changes. Um, the protocol hasn't changed in a material way, uh, except for that reference to licenses. It is, um, it is, you know, it's a different group of people. So we're, we, we believe that that causal chain is broken and that that is, that's really fatal to the claim unless you, you just wish to, you know, the Mr. Barber wants to speculate more, which is this court and the spring quarter said, speculation is not a ground for a preliminary injunction. Um, I want to speak to something that we haven't really talked on or spoken about, but, um, it was in Mr. Barber's reply brief that I feel needs to be addressed and that he continues to rely in his briefing on allegations there outside of the complaint that was actually before the district court. And Mr. Barber argues that the district court isn't bounded by the four corners of the complaint, uh, as it would be in a 12 B six situation. That's, that's absolutely correct. When it comes to a preliminary injunction, the district court can and should look at the evidence before it, but it is bound by the four corners of the complaint when it comes to what claims are actually before it. And it, um, the, the movement has to be able to show that the evidence, the affidavits or hearsay or whatever, whatever the court looks at, that that expanded pool of evidence has to speak to the claims in the complaint. And in this case, there were no claims about Barber's individual characteristics that he's made a feature of his briefing. Um, and I wanted to speak briefly to that individual factor. I'll call it, um, issue. Mr. Barber's pointed to supposed evidence of individual factors. Uh, when you actually break it down and look at what that evidence is, it was very sparse, uh, four printouts regarding heightened weight with no date or indication of when they were taken, how they were taken. Um, and Barber that Barber twice in 20 years has had difficulty giving blood and not had difficulty on other occasions. So the, you know, in short Barber just hasn't presented the district court with evidence that would support those claims or that would justify an abuse of discretion for not granting the preliminary injunction. Was there evidence council that someone with a certain body mass index, uh, would have trouble getting a vein and that doing so would cause that person to super add pain as part of the IV process? No, your honor. While there was testimony from a nurse, she didn't speak to anything regarding BMI. Um, and even if those claims had been before the court, they wouldn't have had, there wouldn't be an abuse of discretion. But now I see my time is closing. So in conclusion, um, unless the court has any questions, I want to say that the people of Alabama and the victims of Barber's crime have waited long enough to obtain justice for the death of Dorothy Epps. This court should not reward Barber's efforts to delay with granting him a stay or denial or reversing the denial of preliminary injunction. If there are no questions, uh, I'll rebuttal. Uh, sure. Thank you. If I could just start with the last point you just discussed, um, the issue of evidence in the record on Mr. Barber's personal risk factors. So as the state concedes, the district court can and must look at the evidence submitted in favor of a preliminary injunction when making its decision. Um, the evidence that we submitted regarding Mr. Barber's BMI compared to the BMI of the men whose executions were botched last year and the evidence that we submitted of the at least two prior occasions of outright failure to find Mr. Barber's veins by ADOC personnel who are supposedly qualified to do so, that evidence was properly before the court at the time of the preliminary injunction. And the fact that the specific evidence, there was no evidence though on what the proper body mass index is, right? In other words, evidence of what the, what the cutoff is for when it's easier to get vein access for a body mass index of 29% as opposed to 35%. That's correct. The state will not tell us what threshold of BMI it is struggling with. So we don't know for sure, but I will, I could just, but counsel, you have an expert who's an expert on IV, um, who you simply could have at, you had a live expert. You simply could have asked at what body mass index has become more difficult to insert IV. I mean, that's a simple question. You're right. It is a fairly simple question. And it's one that the court noted in its recent Smith opinion, when it found that elevated body mass, the council that was based on the complaint. I mean, there's no way we could take that as a found fact in any way whatsoever. And again, I can only speak for myself, but I, I don't see how a pleading in, in one complaint could somehow bind us as a matter of fact and someplace else. And without that, it seems to me that we're left with just evidence of without potentially bought Matt evidence of body mass without understanding how that plays into the larger problem. Sure. So, so two points on that, your honor. Um, first that we are not left with just evidence of Mr. Barber's body mass. Mr. Barber testified at the hearing about two prior occasions where ADOC personnel failed after multiple repeated attempts to access his vein. One included a vein access attempt while an ADOC custody that was halted after eight consecutive failures. And at least one other complete failure of vein access and Holman. My second point on your question is that we don't need a substantial risk, right? I mean, the district court can say there was two incidents among many others where they did find. And I find as a matter of fact, that's not a substantial risk. I mean, that we, we, we couldn't reverse on that basis. Could we, the district court could have made that conclusion, but that's not the conclusion she drew. She specifically said that the fact that Mr. Barber did not allege a specific medical condition in his complaint is the reason why she couldn't credit his testimony about the prior vein access issues. And if I could, I'll just move on to some of the other points that we were brought up in Mr. Anderson's presentation. So one thing that really stood out to me about the state's presentation just now is that Mr. Anderson could not or would not explain what went wrong in any of the last three botched executions. He was asked directly what the problem was with Mr. James, Mr. Miller, and Mr. Smith. And the closest we got to an answer was the comment that those executions were unsuccessful because they ran out of time. Of course, this means that if time was the only problem or the only problem the state is willing to explain on the record, then changing the IV personnel is not a solution. So if the state is not willing to give an explanation, it cannot itself establish any kind of causal link in stopping the problem. If I could also just respond to the point about delay. Can I go back? I just want to push back on the question that, yes, I'm looking at age 18 of the district court's order. Quote, Barber did not express that these difficulties, the prior ones related to a medical condition. And Barber also testified that medical personnel have access to this without issues in other instances. This testimony is insufficient to establish that Barber presents the individual risks, which were present in Smith, that would complicate establishing IV access in his case. That's not a matter of pleading. That's a matter of finding, of insufficiency. How is that, how can we reverse that based on the testimony and evidence that was before the district court? Okay, I'm just looking at that language right now, Your Honor. So to me, the operative phrase here is Barber did not express that these difficulties were related to a medical condition. I think that logic is reading in a requirement that is simply not present in the Eighth Amendment. It just means they're not permanent. In other words, unlike in Nance, for example, where he had a medical condition that made his veins, quote, unquote, weak. There was nothing like that here. So what you just had is two people who maybe weren't that good at it and weren't able to get it. In other words, the district court heard evidence and made a finding. I just, I'm having a hard time understanding how we could find that that's clearly erroneous, such that we would find it likely to success by your position. So I think the problem with the district court's finding about the specific risk factors is that she tied it to the need to allege those risk factors in the complaint. Obviously, this is a very fast moving proceeding, and we introduced evidence as quickly as possible as we got ramped up to go into the evidentiary hearing. But we now have uncontroverted evidence on the record. The state has never submitted anything to controvert this, that Mr. Barber has an elevated BMI near identical to Mr. Smith's BMI, higher than Mr. James' BMI. And the evidence is also uncontroverted that ADOC personnel have had trouble accessing his veins in the past. Are you pointing to the amended complaint here? I'm sorry? Are you pointing to the amended complaint here? No, I'm pointing to evidence that was introduced in the record for purposes of the evidentiary hearing. Did any of the, but did any of the plaintiff's experts say if a person or something the effect of, if a person has a higher BMI, it's more difficult to obtain IV access? Yes. Which witness was that? Lynn Hadaway. Okay. And I believe we also have, okay. So just a quick follow-up on the point I was making before, the state has said they replaced the IV team members, but they also said they found no deficiencies in their IV team. That strongly suggests that the replaced IV team isn't a solution to last year's problems. Barring relief, on Thursday evening, a grave constitutional violation is going to take place that cannot be taken back or cured by any ex post facto means. We know this will happen because it happened the last three times Alabama DOC tried the exact same procedure, and by DOC's own admission, it believes it did nothing wrong in those three executions, and it has no problems to solve. For these reasons, I ask that you grant our motion for stay of execution and reverse the judgment of the district court. Thank you. Thank you for your help, counsel. Court will be adjourned. Thank you, Your Honor.